**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| GOLDEN RULE INSURANCE COMPANY, a foreign corporation,<br><br>       Plaintiff,<br><br>vs.<br><br>THOMAS A. MONTGOMERY and TRACY R. MONTGOMERY, individually, as husband and wife, and as representatives of WYATT A. MONTGOMERY, a minor; and JOHN AND JANE DOES I-X,<br><br>       Defendants. | No. CV-04-0204-PHX-JAT<br><br>**ORDER** |

Pending before the Court is the Plaintiff/Counterdefendant's Motion For Summary Judgment (doc. 73).  The Court now rules on the motion.

I.      BACKGROUND

On January 23, 2002, the Defendants/Counterclaimants (the "Defendants") applied for insurance with Plaintiff/Counterdefendant Golden Rule Insurance Company (the "Plaintiff").  The application form included a medical history section and required an authorization releasing the Defendants' medical records to the Plaintiff.

In February of 2002, the Plaintiff issued the Defendants an insurance policy (the "Policy").  The Defendants cancelled their other insurance policies, allegedly at the request of the Plaintiff.  On May 16, 2002, the Plaintiff requested that Defendant Thomas

1   Montgomery complete and return a "Claimant's Statement and Authorization." The Plaintiff
2   also requested treatment records dating from January 23, 1997.

3          In September of 2002, Defendant Thomas Montgomery was hospitalized for a
4   perforated colon, which required surgery. The resulting medical expenses totaled over
5   $250,000.00, which was billed to the Plaintiff.

6          On December 10, 2002, the Plaintiff received the completed "Claimant's Statement
7   and Authorization." After reviewing the medical records, the Plaintiff believed the
8   Defendants failed to disclose certain information related to Defendant Thomas Montgomery's
9   medical history. The Plaintiff alleges that it would not have issued the Policy if it had known
10  about the omitted information.

11         On February 27, 2003, the Plaintiff advised the Defendants that it was rescinding the
12  Policy. The Plaintiff refused to pay any medical expenses incurred during the policy period,
13  including the expenses related to the perforated colon, on the grounds that the Defendants
14  made false statements on their insurance application. The Plaintiff refunded the premiums
15  paid by the Defendants which amounted to $5,453.47. The Defendants have not endorsed
16  or cashed the check.

17         On January 29, 2004, the Plaintiff brought this action seeking: (1) a rescission of the
18  policy; (2) declaratory relief ordering the Defendants to surrender the signed Policy and
19  certificate of insurance; (3) declaratory relief stating that the certificate of insurance is void;
20  (4) declaratory relief stating that the Plaintiff is not responsible for any medical expenses
21  incurred by the Defendants; and (5) an award of attorney's fees and costs.

22         On April 5, 2004, the Defendants filed a Motion to Dismiss for Lack of Jurisdiction.
23  The Court denied the motion on August 13, 2004. The basis for this Court's jurisdiction is
24  diversity of citizenship pursuant to 28 U.S.C. § 1332(a)(1).

25         On August 7, 2004, the Defendants filed an Answer and Counterclaims asserting
26  claims of breach of contract, bad faith, and seeking punitive damages, compensatory
27  damages, and attorney's fees.

28

1    On November 4, 2004, Steven and Victoria Pettit filed a Motion to Dismiss.  On June

2  9, 2005, the Court granted the motion and dismissed the Defendants' Counterclaim, without

3  prejudice, as to Steven and Victoria Pettit.

4    On October 14, 2005, the Plaintiff filed, under seal, a Motion for Summary Judgment

5  seeking judgment on its claim for rescission, as well as the Defendants' Counterclaims of bad

6  faith and punitive damages.  The Court heard oral argument on the motion on May 22, 2006.

7  I.    LEGAL ANALYSIS AND CONCLUSION

8    The standard for summary judgment is set forth in Rule 56(c) of the Federal Rules of

9  Civil Procedure. Under this rule, summary judgment is properly granted when: (1) no

10  genuine issues of material fact remain; and (2) after viewing the evidence most favorably to

11  the non-moving party, the movant is clearly entitled to prevail as a matter of law.  Fed. R.

12  Civ. P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552-53 (1986);

13  *Eisenberg v. Ins. Co. of N. Am.,* 815 F.2d 1285, 1288-89 (9th Cir. 1987).  The court must

14  resolve all ambiguities and draw all reasonable inferences in favor of the non-moving party.

15  *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996).

16    A.    The Plaintiff's Rescission Claim

17    The Plaintiff argues that, as a matter of law, it satisfies the three conditions set forth

18  in A.R.S. § 20-1109, and is entitled to rescind the Policy.  The Plaintiff moves for summary

19  judgment on its claims for rescission and declaratory relief.[1]  The Defendants point out that

20  the Plaintiff has *already* rescinded the Policy at issue in the rescission claim.  They argue that

21  the only remaining controversy is whether the rescission was lawful -- a determination that

22  is addressed by the Plaintiff's claim for declaratory relief.  The Plaintiff's Motion for

23  Summary Judgment does not include its claim for declaratory relief.  Therefore, the

24  Defendants argue that the Plaintiff's Motion for Summary Judgment is moot.  Alternatively,

25

26    ───────────────

27    [1] The declaratory claims seek return of the signed contract and a statement that the Policy is void.

28    - 3 -

1    the Defendants argue that material questions of fact preclude the entry of summary judgment

2    on the claims for rescission and declaratory judgment.

3          When addressing the Defendants' Motion to Dismiss, on August 13, 2004, this Court

4    held that even though the Plaintiff had already rescinded the Policy, the Plaintiff's Complaint

5    still presents a claim for rescission because the Plaintiff is asking the Court to declare the

6    prior rescission lawful.  The Court declines to revisit its earlier ruling.  The Court will now

7    address the merits of the Plaintiff's Motion for Summary Judgment.

8          Both parties agree that A.R.S. § 20-1109 applies this Court's determination of whether

9    the Plaintiff lawfully rescinded the Policy.  The statute, in relevant part, provides as follows:

> All statements and descriptions in any application for an
> insurance policy or in negotiations therefor, by or in behalf of
> the insured, shall be deemed to be representations and not
> warranties. Misrepresentations, omissions, concealment of facts
> and incorrect statements shall not prevent a recovery under the
> policy unless:
> 1. Fraudulent.
> 2. Material either to the acceptance of the risk, or to the hazard
> assumed by the insurer.
> 3. The insurer in good faith would either not have issued the
> policy, or would not have issued a policy in as large an amount,
> or would not have provided coverage with respect to the hazard
> resulting in the loss, if the true facts had been made known to
> the insurer as required either by the application for the policy or
> otherwise.

A.R.S. § 20-1109.  An insurer may not deny coverage under a policy unless the

insurer can prove that all three conditions of § 20-1109 have been satisfied.  *Valley Farms,*

*Ltd. v. Transcontinental Ins. Co.,* 206 Ariz. 349, 353, 78 P.3d 1070, 1074 (Ct. App. 2004).

The Plaintiff contends that the Defendants failed to disclose that Thomas

- 4 -

Montgomery's medical history included: (1) fevers of unknown origin;[2] (2) abnormal liver biopsy and/or granulomatous hepatitis; (3) abnormal blood tests which indicated an elevated sedimentation rate; (4) a slightly enlarged spleen; and (5) an abnormal echocardiogram.  The Plaintiff contends that had this information been disclosed, it would not have issued the Policy as to any of the Defendants.

In support of its Motion for Summary Judgment the Plaintiff presents the following evidence: (1) portions of the deposition transcript of insurance agent Steven Pettit; (2) portions of the deposition transcript of Tracey Montgomery; (3) "broker's" contract between the Plaintiff and Steven Pettit; (4) portions of the deposition transcript of Thomas Montgomery; (5) Steven Pettit's handwritten notes; (6) insurance application signed by Thomas and Tracey Montgomery; (7) Thomas Montgomery's medical records; (8) affidavit of Carleen McCord; (9) Thomas Montgomery's application for airman medical certification; (10) portions of the deposition transcript of Carleen McCord; (11) insurance certificate issued by the Plaintiff; (12) Feb 15, 2002, letter from the Plaintiff to Thomas Montgomery reflecting an improvement in his health rating and instructing him not to cancel his insurance until he reviews the Policy and accepts the coverage provided; (13) February 26, 2002, letter from Tracey Montgomery to Blue Cross Blue Shield of Arizona asking it to terminate coverage for Thomas, Tracey, and Wyatt Montgomery, but to retain coverage for Olivia Montgomery; (14) May 16, 2002, letter from the Plaintiff to Thomas Montgomery regarding expenses

---

[2] The Plaintiff contends that possible causes of the fevers include: (1) infectious disease; (2) collagen, vascular, or connective tissue disease; or (3) occult neoplasm.

incurred on April 18, 2002, at the Mayo Clinic; (15) portions of the deposition transcript of Danny O'Neal; (16) portions of the deposition transcript of Robert Woodward; (17) June 3, 2002, letter from the Plaintiff to Thomas Montgomery regarding information requested in a prior letter dated May 16, 2002; (18) June 25, 2002, letter to Thomas Montgomery denying all outstanding claims; (19) transcript of July 22, 2002, phone call from Tracey Montgomery to the Plaintiff's claims department; (20) August 28, 2002, letter from the Plaintiff to Thomas Montgomery denying claim for benefits incurred on April 18, 2002; (21) December 4, 2002, letter from Tracey Montgomery to the Plaintiff clarifying Thomas Montgomery's medical history and referencing various attached letters from Mr. Montgomery's physicians; (22) claimant's statement and authorization signed by Thomas Montgomery on December 5, 2002; (23) the Plaintiff's "claim checklist" for Thomas Montgomery; (24) February 7, 2003, letter from the Plaintiff to Thomas Montgomery stating that his outstanding claims are being reviewed; (25) internal memorandum from Carleen McCord stating that if the underwriter had known of Thomas Montgomery's hepatitis, fever of unknown origin, elevated sedimentation rate, abnormal echocardiogram, and spleen enlargement, coverage would have been denied; (26) rescission letter and $5,453.47 refund check from the Plaintiff to Thomas Montgomery; (27) the Plaintiff's first set of interrogatories without responses; and (28) a portion of the Defendants' second supplement to their response to the Plaintiff's non-uniform interrogatories objecting to certain questions.

In opposition to summary judgment, the Defendants argue that the Plaintiff had knowledge of Thomas Montgomery's medical conditions. Specifically, they argue that they

informed the Plaintiff's insurance agent, Steven Pettit, of all known medical conditions. They argue that Mr. Pettit used his discretion in noting the information that he believed was relevant on the application form. They argue that Mr. Pettit told them that the Plaintiff would use their medical releases to obtain and review their actual medical records prior to issuing the Policy.

The Defendants allege that at the time that they filled out the insurance application they did not know about some of Thomas Montgomery's medical conditions and, therefore, lacked any knowledge of the falsity of any omissions related to those conditions. For example, they contend that they had no knowledge of the enlarged spleen or "abnormal" echocardiogram at the time they signed the application. The also contend that at the time that they filled out the application Mr. Montgomery had not been given a diagnosis of hepatitis. With respect to the fever of unknown origin, elevated sedimentation rate, and granulomatous hepatitis, the Defendants argue that Thomas Montgomery's medical providers did not provide him with any diagnosis and suggested that these "symptoms" or "conditions" were not of any medical or clinical significance.[3]

The Defendants also argue that the Plaintiff has failed to prove that it would have denied coverage to Tracey and Wyatt Montgomery if it had known about the omitted information about Thomas Montgomery.

---

[3]  The witnesses in this case use various terms to describe the various issues that Thomas Montgomery was experiencing.  Unless specifically stated, this Court's use of the words "condition" and/or "symptom" does not suggest that Thomas Montgomery had a medical condition, disease, or medically significant symptom as contemplated or defined by the Policy.

In support of their arguments, the Defendants present the following evidence: (1) portions of the deposition transcript of Steven Pettit; (2) portions of the deposition transcript of Tracey Montgomery; (3) portions of the deposition transcript of Thomas Montgomery; (4) the Plaintiff's Responses to the Defendants' non-uniform interrogatories; (5) portions of the deposition transcript of Belinda Murillo; (6) portions of the deposition transcript of Danny O'Neal; (7) portions of the deposition transcript of Tracy Judy; (8) portions of the deposition transcript of Ramona Paddick; (9) portions of the deposition transcript of Robert Woodward; (10) letter to Thomas Montgomery welcoming him, providing insurance identification cards, and instructing him to terminate any overlapping insurance coverage; (11) portions of the deposition transcript of Dr. Daniel Meline; and (12) portions of the deposition transcript of Dr. Douglas Lakin.

The Court has reviewed all the evidence, but will only discuss in detail the evidence that is most relevant to the Court's decision.

Carleen McCord, an underwriter for the Plaintiff, testified that the Plaintiff would not have issued the Policy if it had known about the following conditions: (1) fever of unknown origin and/or hospitalization for fever and fatigue; (2) abnormal blood test results/elevated sedimentation rate; (3) abnormal liver biopsy results and/or diagnosis of granulomatous hepatitis; (4) enlarged spleen; and (5) abnormal cardiac ultrasound. (Affidavit of Carleen McCord).

Insurance agent Steven Pettit testified that he asked Tracey Montgomery a series of

preliminary questions about the Defendants' medical history.[4]  (Transcript of Steven Pettit's Deposition pages 43-50).   The questions included a history of past illnesses and hospitalizations, as well as current treatment.  (*Id*.).  After obtaining a preliminary quote from the Plaintiff, Mr. Pettit met with the Defendants on January 23, 2002, to complete the insurance application.  (*Id*. at 52).   Mr. Pettit filled out the majority of the "applicant information" prior to his arrival at the Defendants' home based on his preliminary conversation with Tracey Montgomery. (*Id*. at 54-57).  He filled in additional portions of the application while at the Defendants' home after asking the Defendants each specific questions.  (*Id*.).

Mr. Pettit testified that the medical history section of the application, which consisted of a series of "yes" or "no" questions, was completed by one of the Defendants.[5]  (*Id*. at 57). He testified that he subsequently reviewed the application, asked follow-up questions, and provided handwritten notes clarifying the "yes" answers.  (*Id*. at 59).  During the questioning, the Defendants disclosed additional information such as Tracey Montgomery's prior treatment for depression, tubal ligation, and c-section, and Thomas Montgomery's prior gallbladder surgery.  (*Id*. at 58-60, 62).  Mr. Pettit noted these conditions in the section entitled "medical history details – all applicants."  (*Id*.; Insurance Application page 3).

Mr. Pettit testified that the Defendants did not tell him that Thomas Montgomery

---

[4] The Defendants were also attempting to obtain insurance for their nanny who is not a party to this lawsuit.

[5] Mr. Pettit does not recall which of the Defendants filled out the medical history section.

suffered in the past from fevers of unknown origin, an abnormal liver biopsy, granulomatous hepatitis, or that he had an abnormal blood test. (Transcript of Steven Pettit's Deposition pages 63, 66). He testified that he would not have completed the application if he had known that Thomas Montgomery was presently undergoing any medical treatment because the application would have been rejected. (*Id.* at 69, 123). He also testified that the Defendants failed to list Doctors Burge, Van Lier Ribbink, and Meline on the application. (*Id.* at 63, 66). Mr. Pettit testified that on Jaunary 23, 2002, Thomas and Tracey Montgomery signed the application agreeing that it was truthful to the best of their knowledge. (*Id.* at 61-62; Insurance Application page 4).

Tracey Montgomery testified that Mr. Pettit is the one who filled out the insurance application, including the medical history section. (*Id.* at 6). She contends that even though she signed the statement saying that she "personally completed" the application, she did not. (*Id.* at 88). Her statement that she did not personally complete the application is consistent with Mr. Pettit's testimony.[6]   (Transcript of Steven Pettit's Deposition pages 54-62).

Tracey testifies that her husband had been sick and/or hospitalized in the past for a fever and gallbladder surgery, but does not recall the specific dates. (Transcript of Tracey Montgomery's Deposition pages 27-28). She testified that she was aware of some of her husband's medical history. (*Id.* at 38). However, she also testified that he was being treated for conditions that she was not aware of at the time they applied for insurance. (*Id.* at 50). Tracy testified that she told Mr. Pettit about her husband's conditions, including the fact that

---

[6] Mr. Pettit admits that he filled out portions of the form.

they were presently unsure of "what was going on" with him.  (*Id* at 50, 66-68).

Tracey testified that Mr. Pettit did not write all of the information down on the application because the information was already included in the medical records.  (*Id.* at 67-68, 70).  Similarly, she testified that the reason that some of the doctors were not listed on the application is because Mr. Pettit would not "take down" some of the names, or specifically disclose treatment relating to those doctors, because the information was already included in the records of the physicians that were listed on the application.  (*Id.* at 5-6, 68, 69, 72, 75).  Tracey testified it was her understanding from Mr. Pettit that the medical records would be obtained and attached to the application before her claim was processed.  (*Id.* at 5-6, 68-72).  She testified that she signed an authorization allowing the Plaintiff to contact all of the Defendants' medical providers in order to verify the information on the application.  (*Id.* at 71).    Question 27 asks the applicant to list, and provide full details, in the medical history details section, all doctors and health care professionals consulted within the last five years.  (Insurance Application page 3).  Mr. Pettit admitted that he is the one who filled out the medical history details section of the insurance application.  (Transcript of Steven Pettit's Deposition pages 54, 57).  Additionally, Mr. Pettit's handwritten notes show that the Defendants disclosed that Thomas Montgomery had "prebarrett's esophagus."  However, Mr. Pettit did not include this information in the medical history details section.  (Insurance Application pages 3-4).

Tracey Montgomery testified that although she signed the statement saying that all information in the application is "true and correct," she now believes that some of the

information was incorrect.  (Transcript of Tracey Montgomery's Deposition page 88).

However, she also contends that Mr. Pettit did not give her a chance to review and read the

entire application before signing it.  (*Id.* at 24, 88-89).  She testified that Mr. Pettit just

instructed the Defendants where to sign, and they signed.  (*Id.*).  She testified that he marked

certain lines with an "X" and stated, "sign, here, here, and here." (*Id.* at 89).

Tracey Montgomery testified that, in retrospect, she now feels that question 22 on the

insurance application should have been answered "yes" because she had depression and her

husband had gallbladder surgery.  (*Id.* at 73-74).  However, as noted previously, she claims

that Mr. Pettit filled out the application and that she did not have a chance to review it before

she signed it.  (*Id.* at 74, 88-89).

It is also relevant that question 22 asked very generally whether the in the last ten

years the applicant had any symptoms, diagnoses, treatment, or disease of the heart or

circulatory system, nervous system, digestive system, muscular system, skeletal system,

respiratory system, reproductive system, urinary system, or thyroid or other glands.

(Insurance Application page 3).  Although the Defendants answered "no" to that question,

they had already answered "yes" to the prior question numbered 18A which disclosed the

gallbladder problem. (*Id.*).  They also answered "yes" to question 20 disclosing that one or

both of the applicants had a prior hospitalization, confinement, surgery, or discussions of

surgery within the last ten years.  (*Id.*).  Although no details regarding this "yes " answer

were written in the medical history details section, it is uncontested that the medical history

details section was filled out by Mr. Pettit.  Thomas Montgomery's gallbladder surgery was

- 12 -

also  disclosed under the medical history details section.  (*Id.*).

Consistent with the testimony of his wife, Thomas Montgomery testified that he did not personally fill out the insurance application.  (Transcript of Thomas Montgomery's Deposition page 90).  He testified that Mr. Pettit asked them a series of questions, and filled out the entire insurance application.  (*Id.* at pages 50-51, 57, 105).  Thomas Montgomery testified that he did not know of the abnormal echocardiogram results or that he had an enlarged spleen at the time that they applied for insurance.  (*Id.* at 69).

Thomas Montgomery testified that he informed Mr. Pettit of all the medical conditions that he could think of.  (*Id.* at 114-115).  He testified that he recalls telling Mr. Pettit about certain conditions that Mr. Pettit did not mark down on the application.  (*Id.* at 55, 57).  He also recalls discussing his treatments with physicians Daniel Meline and John Burge with Mr.Pettit.  (*Id.* at 59). Thomas testified that he does not know why Mr. Pettit did not include the omitted physicians and/or medical history.  (*Id.* at 59, 65, 68).  He testified that he trusted Mr. Pettit, believed him to be thorough, and did not review the application or read the statement of understanding before signing it.  (*Id*. at 56, 65-66, 89, 106).  He testified that Mr. Pettit is the one who filled out the insurance application.  (*Id.* at 56).

Belinda Murillo, the Defendants' nanny, also used Mr. Pettit to apply for an insurance policy with the Plaintiff.  She testified that she was at the counter with the Defendants and Mr. Pettit.  (Transcript of Belinda Murillo's Deposition pages 79-80).  She testified that the Defendants told Mr. Pettit that they "didn't know what was going on" with Thomas Montgomery, and that Thomas was undergoing some testing.  (*Id.* at 80).  Ms. Murillo

- 13 -

1  testified that she and the Defendants signed their insurance applications at the same time.

2  (*Id.* at 82).  Consistent with the Defendants' testimony, Ms. Murillo testified that she did not

3

4  fill out[7] or read her own insurance application, she just signed her name.  (*Id.* at 81-82).

5  Daniel Meline, M.D., testified that Thomas Montgomery was referred to him by Dr.

6  Doug Lakin.  (Transcript of Daniel Meline, M.D.'s Deposition page 24).  He testified that a

7
   "persistent fever of unknown origin" would be considered abnormal but doesn't "mean
8
   much" and " could apply to many different things." (*Id.* at 16-18).  Similarly, he testified that
9

10  an "elevated sedimentation rate"  is "very nonspecific" and "does not narrow it down to any

11  disease  entity  in  particular."    (*Id.* at 17).    With  respect  to  Thomas  Montgomery's

12
    "granulomatous inflammation of the liver," Dr. Meline testified that granulomas are a type
13
14  of cell that can be found in just about any tissue in the body, and that granulomas are

15  "extremely broad topics in medicine." (*Id.* at 19).  He stated that when he saw that Thomas

16  Montgomery had granulomas on his liver, it "did not point to any particular disease or
17
    condition, because the causes are very broad." (*Id.* at 20-21, 49).
18

19  Dr. Meline testified that all of these conditions can be considered abnormal, but he

20  was unable to make any specific diagnosis because they all have such a wide variety of

21  causes. (*Id.* at 21, 59).  With respect to Thomas Montgomery's echocardiogram results, Dr.
22
    Meline testified that a mild left atrial enlargement can either be a normal variant in the heart,
23
24  or a potential indicator of hypertension or vascular disease. (*Id*. at 22).  He testified that the

25  condition can be considered abnormal but is also fairly common.  (*Id.* at 23).  He again

26

27  ───────────────────
    [7] She states that she "may" have written down the name of one doctor.

28                                              - 14 -

specified that all of Thomas Montgomery's symptoms are "extremely ubiquitous and nonspecific," whether looked at independently or together.  (*Id.* at 22-23, 59).

Dr. Meline testified that although he told Dr. Burge in a letter that Thomas Montgomery's liver biopsy showed granulomatous hepatitis, he never used the word hepatitis when discussing the results with the Defendants, instead he told them that the biopsy revealed granulomas and some inflammation.  (*Id.* at 45-46).  Dr. Meline agrees that he personally did not have a diagnosis or understanding of the cause of the granulomas.  (*Id.* at 48, 83).  He testified that he did not have a diagnosis or know what was causing the elevated sedimentation rate and fever.  (*Id.* at 60).  He testified that Dr. Burge had not reached any diagnosis either.  (*Id.* at 60).  Additionally, a letter from Dr. Meline to Dr. Lakin states that Dr. Meline was unable to answer Tracey Montgomery's questions about the possible etiology of her husband's fevers.  (Letter from Dr. Meline to Dr. Lakin).

Douglas Lakin, M.D., testified that an elevated sedimentation rate is a "nonspecific" blood test result indicating some type of inflammatory process in the body, and that the test result may or may not be significant depending on the level.  (Transcript of Douglas Lakin, M.D.'s Deposition pages 13-14).  He testified that virtually any condition, in theory, can cause this symptom.  (*Id.* at 14).  He does not recall whether Thomas Montgomery's level was high enough to be significant.  (*Id*. at 15).

Dr. Lakin testified that a mild left atrial enlargement is a measurement on an echocardiogram that "doesn't indicate anything particularly," and that in most clinical settings the finding is "inconsequential."  (*Id.* at 15-16).  Similarly, he testified that trivial tricuspid

- 15 -

1    and mitral regurgitation are minor aberrations of blood flow through those two valves but

2    that they are not of any clinical significance.  (*Id.* at 31).  Dr. Lakin testified that it is his

3    opinion that Thomas Montgomery's cardiac ultrasound results were "not clinically of any

4    consequence" or "significance," and that he does not believe that Thomas Montgomery has

5    a disease or disorder of the heart.  (*Id.* at 31-32, 40).  In fact, when asked who contacted

6    Thomas Montgomery regarding the test results, Dr. Lakin testified that if he had gotten the

7    results of the echocardiagram, he "probably would not have commented much" on the

8    "minor" findings because "they are not of any significance in [his] mind."  (*Id.* at 32).

9

10

11        Dr. Lakin testified that he does consider granulomatous inflammation of the liver to

12   be an abnormal finding, but that it has different causes, some of which are unexplained.  (*Id.*

13   at 16, 41).  He described the condition as "an abnormal inflammation of the liver,

14   characterized by the microscopic appearance of granuloma, and associated with certain

15   conditions."  (*Id.* at 40).  He agreed that the liver is inflamed but the cause of the

16   inflammation is unknown.  (*Id.* at 40-41).  He agreed that it can "be caused by nothing," and

17   that it can go away on its own.  (*Id.* at 41).  He also agreed that elevated liver function tests

18

19   can indicate inflammation of the liver or can indicate "nothing of clinical significance." (*Id*.

20   at 44).  Dr. Lakin testified that his records contained letters from Thomas Montgomery's

21

22   other treating physicians and agreed that if someone obtained those records, they would

23   obtain the names of Thomas Montgomery's other treating physicians.  (*Id.* at 48).

24

25        Based on the evidence presented by the Plaintiff and the Defendants, and viewing that

26   evidence in the light most favorable to the Defendants, the Court finds that there are material

27

28                                         - 16 -

questions of fact in this case that preclude the entry of summary judgment on the Plaintiff's rescission claim.

The first element of the rescission claim requires the Plaintiff to prove that the Defendants committed actual or legal fraud. *Valley Farms, Ltd.,* 206 Ariz. at 353, 78 P.3d at 1074. Actual fraud requires an intent to deceive. *Id.* Legal fraud exists if the question asked in an insurance application: (1) is one where the facts are within the personal knowledge of the insured: (2) are such that the insurer would naturally have contemplated that the answers represented the actual facts; and (3) the answers are false. *Id.* Where a reasonable man would have known that the answers represented merely the opinion of the insured, there must be an actual intent to deceive and bad faith on the part of the insured. *Id.* The evidence presented by the Defendants is sufficient to raise a question of fact with respect to the fraud element of the Plaintiff's rescission claim.

The evidence is undisputed that Mr. Pettit filled out a large portion of the Defendants insurance application. Although the Plaintiff presents contradictory evidence, the Defendants have presented evidence that suggests that they: (1) disclosed Thomas Montgomery's known medical history, conditions, and doctors to Mr. Pettit; and (2) Mr. Pettit told the Defendants they did not need to list some of the doctors and information on the application because the information was already contained in the medical records of the disclosed physicians.

Knowledge of an insurance agent is, as a matter of law, knowledge of the insurance company, whether or not the information is actually communicated to the insurance company by its agent. *Stewart v. Mutual of Omaha Ins. Co.,* 169 Ariz. 99, 107, 817 P.2d 44,

52 (Ct. App. 1991). Although an insured is under a duty to examine answers to determine if they are accurate and complete, an insurer cannot rely on incorrectly recorded answers known to the insured, if the incorrect answers were entered pursuant to an agent's advice, suggestion, or interpretation. *Id.* at 107-08, 817 P.2d at 52-53. The intent of this rule is to permit an applicant who, in good faith, has done all that he is led by the insurer's agent to believe that he is required to do. *Id.* In such situations, the insurance company must show that representations in the application were those of the insured, and not mistakes of its own insurance agent. *Id.*

The Plaintiff argues that Mr. Pettit was not its agent under the law. The Court disagrees. There are two main types of agency, actual (express) and ostensible (apparent). *Gulf. Ins. Co. v. Grisham,* 126 Ariz. 123, 126, 613 P.2d 283, 286 (1980). The agent's authority is "express" if there is evidence that the principal has delegated authority by oral or written words which authorize him to do a certain act or series of acts. *Id.* If there is no evidence of actual authority, then the next question is whether there is "apparent" or ostensible" agency. *Id.* The "ostensible agent" is one where the principal has "intentionally or inadvertently" induced a third party to believe that a person was its agent. *Id.* Ostensible agency is present when the principal either: (1) knowingly *or* negligently holds his agent out as possessing authority; or (2) permits him to assume he possesses such authority. *Reed v. Gershweir,* 160 Ariz. 203, 205, 772 P.2d 26, 28 (Ct. App. 1989). Apparent authority can never be derived solely from the acts of the agent*. Id.*

Here, the Plaintiff gave Mr. Pettit a "broker's" contract. (Broker's Contract; Transcript

of Steven Pettit's Deposition page 32).  Notwithstanding any disclaimers of agency, the broker's contract did authorize Mr. Pettit to obtain and submit the Plaintiff's insurance applications, to accept initial premiums from clients made payable to the Plaintiff,  and to collect a commission for sale of the Plaintiff's insurance policies.  (Broker's Contract pages 1-3; Transcript of Steven Pettit's Deposition page 32).  The contract binds Mr. Pettit to a confidentiality agreement because the Plaintiff is giving Mr. Pettit access to information the Plaintiff wants to keep confidential such as rates, pricing, computer programs, and product information.  (Broker's Contract page 3).  The contract also charges Mr. Pettit with the responsibility of making sure that the insurance applications are accurately completed by the client or by himself.  (*Id.*).  The contract allows Mr. Pettit to use, with approval, the Plaintiff's advertizing material including brochures, cards, booklets, letters, and prepared sales talks, so long as he does not include or incorporate the materials of any other insurance company. (*Id.* at 5).

The Plaintiff also trained Mr. Pettit to understand and sell its insurance policies.[8]  Mr. Pettit, acting pursuant to this authority, obtained medical history information from the Defendants and conveyed it to the Plaintiff.  Based on the information, the Plaintiff gave Mr. Pettit an initial quote for insurance coverage, which Mr. Pettit conveyed to the Defendants, again pursuant to his authority under the contract.  (Transcript of Steven Pettit's Deposition page 53).  Mr. Pettit came to the Defendants' home armed only with the Plaintiff's insurance application, which he filled out after collecting the Defendants' health information.  (*Id.* at

---

[8] This was brought up at oral argument and was not disputed by the Plaintiff.

54-55, 58).  Presumably, he was again acting pursuant to the authority given to him by the Plaintiff which required him to ensure either himself, or the applicant, completed the forms accurately.

Thomas Montgomery testified that Mr. Pettit only spoke to the Defendants about the Plaintiff's insurance policies.  (Transcript of Thomas Montgomery's Deposition page 115).  Thomas testified that he believed that Mr. Pettit was the Plaintiff's "representative."  (*Id.* at 88, 89, 98, 115).  In fact, Mr. Pettit believed himself to be the Plaintiff's agent.  Steven Pettit testified that he only acts on behalf of his clients in the "beginning" of the process when he is soliciting insurance companies, and that he is acting on behalf of the insurance company when he is "acquiring the appropriate information" from the clients.  (Transcript of Steven Pettit's Deposition pages 16-17).  This understanding is consistent with the responsibilities given by the Plaintiff to Mr. Pettit pursuant to the "broker's" contract.

When, as here, an insurer contemplates that a broker will solicit customers for their benefit, supplies the broker with insurance applications, provides them with training, and provides them with access to sales materials and brochures, there is evidence in support of a finding of ostensible agency.  *See, e.g., Sparks v. Republic Nat'l Life Ins. Co,* 132 Ariz. 529, 541-42, 647 P.2d 1127, 1139-40 (1982); *Curran v. Industrial Comm'n of Ariz.,* 156 Ariz. 434, 438, 752 P.2d 523, 526 (1988).  Thus, the Court finds that the Defendants have presented sufficient evidence to raise questions of fact as to whether: (1) Mr. Pettit was the Plaintiff's ostensible agent; (2) the agent was provided with the relevant medical history, and therefore the Defendants are charged with having the relevant medical history; (3) the

omissions were made by the agent and not the Defendants; (4) the Defendants made omissions in reliance on the agent's advice or interpretation that the information was contained within information or records already disclosed; and (5) the agent induced the Defendants to sign the application without first reviewing it.[9]

The Defendants have also provided evidence that they were unaware that Thomas Montgomery had an enlarged spleen or an abnormal echocardiogram at the time they signed the application.   There is no fraud where the omitted information was not within the applicant's personal knowledge and there is no evidence of an actual intent to deceive. *Equitable Life Assur. Soc. of the U.S. v. Anderson,* 151 Ariz. 355, 357, 727 P.2d 1066, 1068 (Ct. App. 1986) (legal fraud requires personal knowledge, actual fraud requires an intent to deceive); *accord Valley Farms, Ltd.,* 206 Ariz. at 353, 78 P.3d at 1074 (discussing legal and actual fraud).   Although the Plaintiff contends that the Defendants were aware of these conditions at the time they applied for insurance with the Plaintiff, the Defendants have succeeded in raising a material question of fact as to this issue.

Additionally, with respect to the fever of unknown origin, elevated sedimentation rate, and glaucomatous hepatitis, the Defendants have provided evidence that Thomas

---

[9] In circumstances, such as here, where the agent undeniably filled out a large portion of the application, and the insured claims that the agent induced it to sign the application without first reviewing it, there is at the very least a question of fact as to whether the incorrect information was supplied by the insured, or the agent. *See Smith v. Republic Nat. Life Ins. Co.,* 107 Ariz. 112, 116, 483 P.2d 527, 531 (1971) (discussing an insured's failure to review an application before signing where the agent filled out the application and induced the insured to sign the application without first reviewing it).

1   Montgomery's medical providers did not provide him with any "diagnosis" and suggested
2   that his "symptoms" were not of any clinical significance.  For example, Tracey Montgomery
3   acknowledged in her deposition that Thomas was having some problems but testified that the
4   Defendants had not been told that Thomas had been diagnosed with a medical condition
5   relating to his fever of unknown origin, elevated sedimentation rate, or glaucomatous
6   hepatitis.  Further, she testified that she and Thomas were told that the "symptoms" he was
7   experiencing were not clinically significant as to any specific disorder or diagnosis.  These
8   statements are supported by the deposition testimony of doctors Meline and Lakin.
9
10
11          Whether a question on an insurance application elicits facts or opinion depends upon
12  the evidence in the particular case.  *Russell v. Royal Maccabees Life Ins. Co.,* 193 Ariz. 464,
13  471, 974 P.2d 443, 450 (Ct. App. 1999); *Stewart,* 169 Ariz. at 103, 817 P.2d at 48.  Not
14  every "symptom" that a person experiences relates to an underlying medical condition or
15  disorder.  *See Stewart,* 169 Ariz. at 105, 817 P.2d at 50.  What constitutes a "symptom" at
16  all, or at what point a particular individual might characterize his body's afflictions as
17  amounting to a medical "condition" is highly subjective, and is "often more akin to an
18  opinion than to fact."  *Id.*  Therefore, by failing to disclose the above information, the
19  Defendants essentially stated an "opinion," based on statements made by Thomas
20  Montgomery's physicians, that what Thomas was feeling was not clinically significant or
21  specifically symptomatic of any underlying medical condition, disease, or disorder.  *See id.*
22          The insurer must prove an intent to deceive, or actual fraud, to rescind a policy where
23  the response is merely an expression of opinion.  *Russell,* 193 Ariz. at 471, 974 P.2d at 450.

The Court finds that the Plaintiff has not provided any evidence of actual fraud or an intent to deceive the Plaintiff.  Furthermore, the Defendants have raised a material question of fact as to whether their answers with respect to the above "conditions" or "symptoms" were unreasonable or fraudulent.  *See, e.g., Stewart,* 169 Ariz. at 105, 817 P.2d at 50.

An insurer cannot rescind a policy based on an insured's misrepresentations if the insurer has actual knowledge of the true facts.  *CenTrust Mortgage Corp. v. PMI Mortgage Ins. Co.,* 166 Ariz. 50, 56, 800 P.2d 37, 43 (Ct. App. 1990).  Similarly, an insurer cannot rescind a policy based on alleged misrepresentations if it has "sufficient indications that would put a prudent person on notice so as to induce an inquiry which, if done with reasonable thoroughness, would reveal the truth."  *Id.*  There are significant fact questions surrounding how much medical information the Defendants provided Mr. Pettit, and whether Mr. Pettit told the Defendants that they didn't need to disclose some of the information and the doctors because the information would be in the medical records of the physicians that were disclosed.  It is undisputed that the Defendants signed a medical record release.  The medical records from the named physicians do reference the omitted physicians and medical conditions.  Thus, there is a question of fact in this case as to whether the Plaintiff had actual knowledge of the information, or was aware of such facts as would put a reasonably prudent insurer on inquiry and cause it to investigate further.  *CenTrust Mortgage Corp.,* 166 Ariz. at 56, 800 P.2d at 43.

The Defendants argue that notwithstanding any misrepresentation on the initial application, the Plaintiff is estopped from rescinding the policies at issue in this case.  The

elements of estoppel are:  (1) conduct which induces another to believe in certain material facts; (2) the inducement results in acts in reliance; (4) the reliance is reasonable; (5) there is resulting injury.  *Darner Motor Sales, Inc. v. Universal Underwriters Ins. Co.,* 140 Ariz. 383, 394, 682 P.2d 388, 399 (1984).   The Defendants allege that Mr. Pettit told the Defendants that the Plaintiff would review the medical records before providing coverage.  Additionally, the Defendants allege that the Plaintiff sent the Defendants a letter instructing them to cancel their other insurance coverage.   In reliance on these representations, the Defendants argue, they cancelled their Blue Cross Blue Shield policy leaving them with no insurance coverage when the Plaintiff refused to pay their claims.

Mr. Pettit testified that he told the Defendants not to cancel their existing insurance coverage until the Plaintiff had a chance to ensure that all the information provided on the application was accurate. (Transcript of Steven Pettit's Deposition page 77).  However, page 2 of the insurance application provides that by signing the application, the Defendants are agreeing to terminate any existing insurance coverage.  (Insurance Application page 2).

The Plaintiff sent Thomas Montgomery a letter stating that they had finished processing his application, and asking him not to terminate his other insurance until he read the Policy and agreed to accept the benefits provided.  (February 15, 2002, letter from the Plaintiff to Thomas Montgomery).  Presumably, the Defendants agreed to accept the benefits because the Plaintiff subsequently sent the Defendants a packet that included a "welcome letter," certificate of insurance, and identification cards.  (Defendants' Exhibit 10/Welcome Letter from the Plaintiff to Thomas Montgomery).  The letter from the Plaintiff explicitly

stated:

> Please note, all other insurance still in force as of the effective
> date of this coverage should be terminated.  Failure to do so may
> result in voidance of your coverage with Golden Rule.

(Transcript of Tracey Montgomery's Deposition page 86; Defendants' Exhibit 10/Letter from

Golden Rule to Thomas Montgomery).  Tracy Judy, a "pre-screener" for the Plaintiff,

testified that based on the type of coverage the Plaintiff was providing the Defendants, the

Defendants were "not allowed" to have other insurance.  (Transcript of Tracey Allen Judy's

Deposition page 29).

After being instructed by the Plaintiff to cancel all other insurance, Tracey

Montgomery sent a letter to Blue Cross Blue Shield of Arizona asking it to terminate

coverage for Tracey, Thomas, and Wyatt Montgomery.  (February 26, 2002, letter from

Tracey Montgomery to Blue Cross Blue Shield of Arizona).  It is undisputed that after the

Defendants canceled their Blue Cross Blue Shield insurance policy the Defendants incurred

approximately $250,000.00 in medical expenses which the Plaintiff is now seeking to avoid

through rescission of the Policy.

Based on the above facts, the Court finds that the Defendants have succeeded in

raising a material question of fact regarding whether the Plaintiff should be estopped from

rescinding the policies at issue in this case based on a theory that the Defendants reasonably

relied upon the Plaintiff's instruction to cancel all other insurance coverage.

For the reasons set forth above, the Plaintiff's Motion for Summary Judgment is

denied with respect to its rescission claim.[10]  Because there is a material question of fact with respect to the rescission claim, summary judgment is not appropriate on the Plaintiff's derivative claims seeking declaratory relief.  The Court will now address the Plaintiff's Motion for Summary Judgment as it applies to the Defendants' Counterclaims.

B.    Defendants' Bad-Faith Claim

The Plaintiff argues that the Defendants' bad-faith claim is derivative of the insurance contract.  The Plaintiff further argues that if the Court grants the rescission claim, the Policy is void.  Once the Policy is void, the Plaintiff argues, the derivative claims become moot.  Because the Court has denied the Plaintiff's Motion for Summary Judgment with respect to the claim for rescission, the Court does not need to address the Plaintiff's argument that the Defendants' bad-faith claim is moot.

The Plaintiff also argues that it is entitled to summary judgment because Arizona law requires the Defendants to set forth facts which indicate that the Plaintiff lacked a reasonable basis for denying the Defendants' claims and/or rescinding their policies.  The Court agrees that this is an accurate characterization of the law.  *See, e.g., Noble v.  Nat'l Am.  Life Ins. Co.,* 128 Ariz. 188, 189, 624 P.2d 866, 867 (1981).

In Arizona, the tort of bad faith shares elements of both a negligence action and an intentional tort.  *Tru Joist Corp. v. Safeco Ins. Co. of Am.,* 153 Ariz. 95, 104, 735 P.2d 125, 134 (Ct. App. 1987).  The tort consists of two elements.  *Id.*  The insured must show that: (1)

---

[10] Because there is a question of fact with respect to the first element of the Plaintiff's claim, the Court need not address the second and third elements.

the insurer acted *unreasonably* in its handling of the insured's claim; and (2) that the insurer acted *knowing* that it was acting unreasonably, or *with such reckless disregard* that knowledge may be imputed to it. *Id.* The first element is a clear objective test: did the insurance company act in a manner consistent with the way a reasonable insurer would be expected to act under similar circumstances. *Id.* This is the threshold test for all bad-faith actions. *Id.*

The tort of bad faith only arises when an insurer *knowingly* or *intentionally* denies or fails to process or pay a claim *without a reasonable basis* for such action. *Lasma Corp. v. Monarch Ins. Co.,* 159 Ariz. 59, 63, 764 P.2d 1118, 1122 (Ariz. 1988); *Trus Joist Corp.,* 153 Ariz. at 104, 735 P.2d at 134. Mere negligence or inadvertence is not sufficient to satisfy the "intent" necessary to establish bad faith. *Trus Joist Corp.,* 153 Ariz. at 104, 735 P.2d at 134. The insurer must intend the act or omission and must form that intent without reasonable or "fairly debatable" grounds. *Id.* Thus, if an insurer's conduct is reasonable or fairly debatable, there is no liability for bad faith. *Id.*

Whether the insurer acted reasonably under a particular set of circumstances is sometimes a question of fact. However, there are times when the issue of bad faith is not a question appropriate for determination by the jury. *Aetna Cas. and Sur. Co. v. Maricopa County Super. Ct.,* 161 Ariz. 437, 440, 778 P.2d 1333, 1336 (Ct. App. 1989); *accord Lasma Corp.,* 159 Ariz. at 63, 764 P.2d at 1122. This is one of those instances.

Although the Plaintiff and the Defendants have presented contradicting evidence, a reasonable juror could infer from the evidence in this case that the Defendants provided

materially inaccurate information on the insurance application. *See Brown,* 194 Ariz. at 92, 977 P.2d at 814.  Under Arizona common law an insurer is entitled to rescind a policy if the insured makes misrepresentations on the insurance application and the misrepresentations are material to the risk insured. *Brown v. U.S. Fidelity and Guar. Co.,* 194 Ariz. 85, 92, 977 P.2d 807, 814 (1998); *CenTrust Mortgage Corp. v. PMI Mortgage Ins. Co.,* 166 Ariz. 50, 55, 800 P.2d 37, 42 (Ct. App. 1990).  A.R.S. § 20-1109 provides a basis for rescission under similar circumstances.

It cannot be said that it was unreasonable for the Plaintiff to rescind the policies and deny coverage because the Plaintiff's entitlement to do so under Arizona law based on material misrepresentations on Thomas Montgomery's insurance application is fairly debatable. *Trus Joist Corp.,* 153 Ariz. at 104, 735 P.2d at 134.  The Defendants have not provided any evidence that the Plaintiff not only acted unreasonably but that it knew or was conscious of the fact that its conduct was unreasonable and proceeded despite that knowledge.

With respect to the claims of Tracey and Wyatt Montgomery, it is clear from page 6 of the application that Thomas Montgomery is the "primary insured" and "accountholder" of the Policy, and that Tracey and Wyatt Montgomery are his dependents.  Robert Woodward, a claim processor for the Plaintiff, testified in his deposition that when a determination is made that a primary insured would not have been offered any coverage, the entire policy is voided.  (Transcript of Robert Woodward's Deposition pages 163-164).  Based on the language used in the application and Policy, the insurance company had a fairly

debatable argument that the dependants' right to insurance was derivative of the primary insurer's right to insurance.  Once again, the Defendants have failed to come forward with any evidence that the Plaintiff not only acted unreasonably but that it knew or was conscious of the fact that its conduct was unreasonable and proceeded despite that knowledge.

The Defendants are mistaken in presuming that the reasonableness of the insurer's evaluation of a particular claim will always be a question for the jury.  The appropriate inquiry is actually "whether there is sufficient evidence from which reasonable jurors could conclude that in the investigation, evaluation, and processing of the claim, the insurer acted unreasonably and either knew or was conscious of the fact that its conduct was unreasonable." *Zilisch v. State Farm Mutual Automobile Ins. Co.,* 196 Ariz. 234, 238, 995 P.2d 276, 280 (2000).  Because there is insufficient evidence for a reasonable juror to reach such a conclusion, there is no question for the jury in this case.

Based on the state of the law and the facts at issue in this case, the Plaintiff acted in a manner consistent with the way a reasonable insurer would be expected to act under similar circumstances.  Because the Plaintiff has failed to come forward with evidence from which reasonable jurors could conclude that the Plaintiff: (1) acted unreasonably; and (2) knew or was conscious of the fact that its conduct was unreasonable, the the Plaintiff's Motion for Summary Judgment is granted with respect to the Defendants' bad-faith Counterclaim.

C.    Defendants' Punitive-Damages Claim

The Plaintiff argues that it is entitled to summary judgment on the Defendants' punitive-damages Counterclaim because the Plaintiff's conduct, even if true, fails to rise to

the level of intent necessary to award punitive damages.  The Court agrees.

The party claiming punitive damages has the burden of proving by clear and convincing evidence that the wrongdoer acted with an "evil mind."  *Thompson v. Better-Bilt Aluminum Products Co., Inc*., 171 Ariz. 550, 557, 832 P.2d 203, 210 (1992).  In determining whether an individual acted with the requisite evil mind, courts look at the nature of the conduct, including the reprehensibility of the conduct and the severity of the harm likely to result, the harm that has occurred, the duration of the misconduct, the degree of awareness of the harm or risk of harm, and any concealment of it.  *Id.*  Additionally, similar to a bad-faith claim, punitive damages are unavailable unless the alleged wrongdoer is *consciously aware of the wrongfulness or harmfulness of his conduct and yet continues to act* in the same manner in deliberate contravention to the rights of the victim.  *Id.* 171 Ariz. at 556, 832 P.2d at 209.

In bad-faith cases, punitive damages are not available unless the evidence establishes that, in addition to bad faith, the insurer acted with an evil mind.  *Gurule v. Illinois Mut. Life and Cas. Co.,* 152 Ariz. 600, 601, 734 P.2d 85, 86 (1987).  In other words, the evidence needed to support an award of punitive damages must reflect something more than reckless disregard.  *Farr v. Transamerica Occidental Life Ins. Co.,* 145 Ariz. 1, 8, 699 P.2d 376, 383 (Ct. App. 1985).

The Court has already determined that the Plaintiff's conduct – denying the Defendants' claims and rescinding the Policy – was reasonable.  The Defendants have failed to present evidence that the Plaintiff was consciously aware that rescinding the Policy and

denying the Defendants' claims was "wrongful" and yet did so in deliberate contravention to the Defendants' rights.

The Defendants have failed to meet their burden by coming forth with some evidence suggesting that the Plaintiff acted with the requisite intent to harm the plaintiff, or the "evil mind" necessary to support a claim for punitive damages.   The Plaintiff's Motion for Summary Judgment is granted with respect to the Defendants' punitive-damages Counterclaim.

/ / /

1

2    Accordingly,

3        IT IS ORDERED DENYING IN PART AND GRANTING IN PART the Plaintiff's

4    Motion for Summary Judgment (doc. 73).  The Plaintiff's Motion for Summary Judgment is

5    denied with respect to the Plaintiff's claims for rescission and declaratory relief and granted

6    with respect to the Defendants' Counterclaims for bad faith and punitive damages.

7        DATED this 5th day of June, 2006.

8

9

10

11

12

13

14    _____
              James A. Teilborg
15           United States District Judge

16

17

18

19

20

21

22

23

24

25

26

27

28